U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**

APR 2 7 2012

~~CHRIS R. JOHNSON, CLERK~~

BY

DEPUTY CLERK

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of Nominal Defendant Wal-Mart Stores, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> H. LEE SCOTT JR., MICHAEL T. DUKE, S. ROBSON WALTON, JIM C. WALTON, JAMES W. BREYER, M. MICHELLE BURNS, CHRISTOPHER J. WILLIAMS, DOUGLAS N. DAFT, LINDA S. WOLF, ROGER C. CORBETT, AIDA M. ALVAREZ, JAMES I. CASH, JR., GREGORY B. PENNER, ARNE M. SORENSON, STEVEN S. REINEMUND, EDUARDO CASTRO-WRIGHT, THOMAS A. MARS, THOMAS D. HYDE, LEE STUCKY, CRAIG HERKERT, EDUARDO F. SOLORZANO MORALES, JOSE LUIS RODRIGUEZMACEDO RIVERA, <br><br> Defendants, <br><br> – and – <br><br> WAL-MART STORES, INC., a Delaware Corporation, <br><br> Nominal Defendant. | No. <br><br> JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**PROLOGUE**

In a confidential report to his superiors, Wal-Mart's lead investigator, a former FBI special agent, summed up their initial findings this way: "There is reasonable suspicion to believe that Mexican and USA laws have been violated."

David Barstow, Wal-Mart Hushed Up a Vast Mexican Bribery Case, *The New York Times* (Apr. 21, 2012).

Plaintiff Louisiana Municipal Police Employees' Retirement System ("Plaintiff") on behalf of Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company"), derivatively, alleges upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon a review of publicly available information, including Securities and Exchange Commission ("SEC") filings by Wal-Mart, and media reports about Wal-Mart and Defendants, the following:

## INTRODUCTION

1.      This is a shareholder derivative action brought by Plaintiff against current and former directors and officers of Wal-Mart for breaches of their fiduciary duties owed to the Company and its shareholders. Defendants breached their fiduciary duties by causing and/or knowingly allowing Wal-Mart's subsidiary Wal-Mart de Mexico ("Walmex") to engage in potential violations of the Foreign Corrupt Practices Act ("FCPA") from at least 2005, and to cover up the violations until December 2011, when it learned of an investigation by *The New York Times* that was ultimately published in an article on April 23, 2012 (the "Relevant Period").

2.      Wal-Mart is America's eighth largest company and one of the world's largest retailers. It achieved this success by slashing the costs of supply and overhead, and passing much of those savings on to the consumer. Competitors, including mom and pop stores, often found those savings impossible to match. As a result, Wal-Mart was able to quickly expand throughout the United States.

3.      In recent years, however, the Company has seen fierce competition from online retailers like Amazon, which -- without the cost of running physical stores -- in many cases has been able to match or even beat Wal-Mart at price-cutting. Moreover, Wal-Mart's incredible growth within the United States has begun to slow because the Company has already opened stores in most prime locations. This was a major problem because Wal-Mart's culture was built on the expectation of double-digit sales and profit gains year after year. Wal-Mart's stock price, which had jumped 1,173% during the 1990s, managed meager growth in the new century, falling 20% between 2000 and 2005. Accordingly, Wal-Mart and its management were under

2

excruciating pressure from frustrated investors to get the stock price up.

4.      In order to continue growing and, concomitantly, raise the Company's stock price, Wal-Mart and its executives knew that the key was to continue its international expansion. They also knew that they needed to avoid costly missteps – such as the debacles the Company had experienced in Germany and South Korea, two botched attempts at international expansion that were money losing failures.

5.      Wal-Mart's first foray into international expansion began in 1991 when it opened its first Wal-Mart de Mexico, or Walmex, as the Company is known locally, in Mexico City, then part of a joint venture. Since then, Wal-Mart's growth in Mexico has been so rapid that one of every five Wal-Mart stores is now in that country. With 2,100 stores and 209,000 employees in Mexico, it is the country's largest private employer.

6.      Unfortunately for Wal-Mart and its shareholders, the Company's success in Mexico was not the result of hard work and simply being better than its competition. Rather, as set forth in an April 21, 2012, *New York Times* story by Pulitzer Prize-winning reporter David Barstow, Wal-Mart's growth in Mexico was fueled by millions of dollars in bribes to Mexican authorities. Mr. Barstow's article revealed, among other things, that:

- Walmex systematically bribed Mexican government officials for years.

- The bribes, which may have totaled more than $24 million, were paid to win permission to open new stores vastly more quickly than would have been possible had the Company adhered to Mexican laws.

- The bribes were initially hidden from Wal-Mart's global headquarters in Bentonville, Arkansas, by disguising them as normal legal bills (a.k.a., accounting fraud).

- One of the key executives in charge of the bribery payments quit the Company in 2005 after being passed over for promotion. He then detailed his behavior to some of Wal-Mart's lawyers, implicating many senior Walmex executives in the process. This executive, Sergio Cicero Zapata ("Cicero"), conducted 15 hours of on-the-record interviews with *The New York Times*.

- Wal-Mart's global headquarters immediately launched an investigation of the practice.   But, despite finding much evidence of at least highly suspicious

3

behavior (and, at worst, clear violations of Mexican and U.S. laws), Walmart effectively shut the investigation down.

- The CEO of Wal-Mart de Mexico during the period of the bribery scandal, Eduardo Castro-Wright ("Castro-Wright"), is said to have *personally approved of the bribes*. Soon thereafter, Castro-Wright was praised by Wal-Mart's senior team for his astonishing success in Mexico and promoted to run the Company's United States business. Castro-Wright is currently the vice-chairman of Wal-Mart.

- Wal-Mart's senior executives were terrified about what the bribery scandal would do to Wal-Mart's reputation for high ethical standards if it were ever made public.

- Wal-Mart's then-Chief Executive Officer ("CEO"), H. Lee Scott, Jr. ("Scott"), a current Wal-Mart board member and defendant herein, was briefed on the investigation. He reportedly rebuked the Company's investigators for being "too aggressive."

- When an outside law firm specializing in the Foreign Corrupt Practices Act ("FCPA") recommended a four-month, fine-tooth-comb investigation, management chose to go with a two-week-long "preliminary inquiry." Instead of delegating the final report to an independent official, the Company actually shipped all the investigation's files from the U.S. to Mexico and appointed the Mexican general counsel who was implicated in the bribes as head of the down-sized investigation. Not surprisingly, the "preliminary inquiry" found no wrongdoing.

- Wal-Mart's current CEO, Michael Duke ("Duke"), a current Wal-Mart board member and defendant herein, was chairman of Wal-Mart International at the time of the scandal. He received frequent briefings about the bribery allegations and progress of the investigation.

7. Only after learning of *The New York Times'* investigation did Wal-Mart inform the U.S. Justice Department ("DOJ") and SEC, in December 2011, that it had begun an internal investigation into possible violations of the Foreign Corrupt Practices Act.

8. As a result of the Board's actions, the Company has already suffered, and will continue to suffer, substantial financial damage. Wal-Mart's goodwill and reputation have also been horribly damaged by the Board's actions in discovering and then "burying" the wrongdoing alleged herein. Moreover, the Company is now threatened with several serious criminal and regulatory investigations, which will almost certainly result in criminal indictments and/or civil enforcement actions, either of which could impair the Company's ability to gain access to new

4

domestic and international markets. The Company will also, no doubt, be the target of shareholder lawsuits, which it will be forced to defend.

9.       Since the Company remains under the control and/or influence of the primary wrongdoers who: (1) have substantial conflicts; and/or (2) may be implicated in the commission of the wrongful conduct alleged herein, Wal-Mart is unable to protect itself or remedy the wrongs inflicted upon it. Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of the Company and for restitution to the Company for, among other things, the costs and expenses that have, and will be paid, by the Company as a result of the Defendants' wrongdoing.

## JURISDICTION AND VENUE

10.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2). Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.       The Court has personal jurisdiction over each Defendant because each Defendant has committed acts related to the claims at issue in this Complaint within this District.

12.       Venue is proper in this district because Nominal Defendant Wal-Mart is headquartered in this District and a number of the Individual Defendants are citizens of the State of Arkansas. Additionally, venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.

## PARTIES

13.       Plaintiff Louisiana Municipal Police Employees' Retirement System is a shareholder of Wal-Mart and has continuously held its shares at times relevant hereto. Plaintiff is a citizen of Louisiana.

14.       Nominal Defendant Wal-Mart is a Delaware corporation with its principal place of business at 702 S.W. 8th Street, Bentonville, Arkansas 72716.

5

15. Defendant Scott has served as a director of Wal-Mart since 1999. He served as Wal-Mart's President and CEO from January 2000 through January 31, 2009. He continued to serve as an Executive Officer of Wal-Mart and as Chairman of the Executive Committee until his retirement on January 31, 2011. Prior to serving as President and CEO of Wal-Mart, he held other positions with Wal-Mart since joining the Company in September 1979. Upon information and belief, Defendant Scott is a citizen of Arkansas.

16. Defendant Duke has served as a director of Wal-Mart since November 2008. He is the President and CEO of Wal-Mart. He joined Wal-Mart in July 1995, and has served as the Vice Chairman with responsibility for Wal-Mart International beginning in September 2005 and as Executive Vice President and President and CEO of Wal-Mart U.S. beginning in April 2003. Upon information and belief, Defendant Duke is a citizen of Arkansas.

17. Defendant S. Robson Walton has served as a director of Wal-Mart since 1978. He has served as Chairman of the Board since 1992. He joined Wal-Mart in 1969 and, prior to becoming Chairman in 1992, held a variety of positions with the Company, including Senior Vice President, Corporate Secretary, General Counsel and Vice Chairman. He is the son of Wal-Mart's founder Sam Walton, the brother of Defendant Jim C. Walton, and the father-in-law of Defendant Gregory Penner. Upon information and belief, Defendant S. Robson Walton is a citizen of Arkansas.

18. Defendant Jim C. Walton has served as a director of Wal-Mart since 2005. He is the son of Wal-Mart's founder Sam Walton and the brother of Defendant S. Robson Walton. Upon information and belief, Defendant Jim Walton is a citizen of Arkansas.

19. Defendant Gregory B. Penner has been a director of Wal-Mart since 2008. From 2002 to 2005, he served as Wal-Mart's Senior Vice President and Chief Financial Officer-Japan. He is a son-in-law of Defendant S. Robson Walton. Upon information and belief, Defendant Penner is a citizen of California.

20. Defendant James W. Breyer has served as a director of Wal-Mart since 2001. Upon information and belief, Defendant Breyer is a citizen of California.

6

21.     Defendant M. Michelle Burns has served as a director of Wal-Mart since 2003. Upon information and belief, Defendant Burns is a citizen of New York.

22.     Defendant Christopher J. Williams has served as a director of Wal-Mart since 2004. He has served as member of the Board's Audit Committee since at least 2005 and has been its Chairman since 2008. Upon information and belief, Defendant Williams is a citizen of New York.

23.     Defendant Douglas N. Daft has served as a director of Wal-Mart since 2005. Upon information and belief, Defendant Daft is a citizen of Florida.

24.     Defendant Linda S. Wolf has served as a director of Wal-Mart since 2005. Upon information and belief, Defendant Wolf is a citizen of Illinois.

25.     Defendant Roger C. Corbett has served as a director of Wal-Mart since 2006. Upon information and belief, Defendant Corbett is a citizen of Australia.

26.     Defendant Aida M. Alvarez has served as a director of Wal-Mart since 2006. She is a member of the Board's Audit Committee. Upon information and belief, Defendant Alvarez is a citizen of Puerto Rico.

27.     Defendant James I. Cash, Jr. has served as a director of Wal-Mart since 2006. He is a member of the Board's Audit Committee. Upon information and belief, Defendant Cash is a citizen of Massachusetts.

28.     Defendant Arne M. Sorenson has served as a director of Wal-Mart since 2008. He is a member of the Board's Audit Committee. Upon information and belief, Defendant Sorenson is a citizen of Maryland.

29.     Defendant Steven S. Reinemund has served as a director of Wal-Mart since 2010. Upon information and belief, Defendant Reinemund is a citizen of Minnesota.

30.     Defendant Castro-Wright joined Wal-Mart in 2001 and led its business in Mexico until becoming President and CEO of the Company's U.S. operations in 2005. He was named a Vice-Chairman of the Company in 2008. Upon information and belief, Defendant Castro-Wright is a citizen of Arkansas.

7

31.     Defendant Thomas A. Mars was Wal-Mart's General Counsel from 2002 to 2009. He currently serves as Executive Vice President and Chief Administrative Officer for Wal-Mart U.S. Upon information and belief, Defendant Mars is a citizen of Arkansas.

32.     Defendant Thomas D. Hyde served as Executive Vice President of Legal Compliance Ethics and Corporate Secretary of Wal-Mart from June 2005 to August 1, 2010. From June 2003 to June 2005, he served as Executive Vice President, Legal and Corporate Affairs of Wal-Mart. Upon information and belief, Defendant Hyde is a citizen of Kansas.

33.     Defendant Lee Stucky was a Senior Vice President and Chief Administrative Officer for Wal-Mart International in 2005. Upon information and belief, Defendant Stucky is a citizen of Kansas.

34.     Defendant Craig Herkert was the Chief Executive of Wal-Mart Latin America in 2005. Upon information and belief, Defendant Herkert is a citizen of Minnesota.

35.     Defendant Eduardo F. Solorzano Morales was the CEO of Wal-Mart de Mexico in 2005. He is now Chief Executive of Wal-Mart Latin America. Upon information and belief, Defendant Solorzano Morales is a citizen of Mexico.

36.     Defendant Jose Luis Rodriguezmacedo Rivera ("Rodriguezmacedo") was the General Counsel of Wal-Mart de Mexico in 2005. He was Senior Vice President for Legal, Ethics and Compliance at Wal-Mart de Mexico until April 2012. Upon information and belief, Defendant Rodriquezmacedo is a citizen of Mexico.

37.     The Defendants set forth in Paragraphs 15-36 shall be referred to collectively as the "Individual Defendants."

## Directory of People Mentioned in the Conduct Allegations

| Name | Position | Relevance |
|---|---|---|
| Bob Ainley | Senior internal auditor for Wal-Mart, 2005 | He was part of the investigation into the bribery allegations and now holds a senior finance position with Wal-Mart International. |
| Pablo Alegria Con Alonso | Lawyer in Mexico City | He is said to have worked as a "gestor", or fixer, for Wal-Mart de Mexico, paying bribes to government officials. |
| Jose Manuel Aguirre Juarez | Lawyer in Mexico City | He is said to have worked as a "gestor", or fixer, for Wal-Mart de Mexico, paying bribes to government officials. |
| Eduardo Castro-Wright | Chief Executive of Wal-Mart de Mexico until early 2005 | He is described as the driving force behind systemic bribery in Mexico. He was now vice chairman of Wal-Mart. |
| Sergio Cicero Zapata | Lawyer in Wal-Mart de Mexico's real estate department until September 2004 | He told company lawyers that Wal-Mart de Mexico had paid bribes to obtain permits for new stores. |
| Michael T. Duke | Vice chairman, Wal-Mart, 2005 | As the executive overseeing Wal-Mart International, he received detailed information about the bribery allegations. He is now Wal-Mart's chief executive. |
| Michael Fung | Senior vice president for internal audit services at Wal-Mart, 2005 | He was one of the executives who supervised the investigation into the bribery allegations. He retired from Wal-Mart this year. |
| Ronald Halter | Special investigator for Wal-Mart, 2005 | He led the initial inquiry into the bribery allegations, concluding there was reason to believe laws had been violated. He left Wal-Mart in 2006. |
| Craig Herkert | Chief Executive of Wal-Mart Latin America, 2005 | He was one of the executives who supervised the company's investigation into the bribery allegations. He left Wal-Mart in 2009. |
| Thomas D. Hyde | Executive vice president of Wal-Mart, 2005 | He was one of the executives who supervised the company's investigation into the bribery allegations. He left Wal-Mart in 2010. |
| Jospeh R. Lewis | Corporate investigations for Wal-Mart, 2005 | He helped lead the investigation into the bribery allegations. He left Wal-Mart this year. |
| Thomas A. Mars | General counsel for Wal-Mart, 2005 | He supervised the company's investigation into the bribery allegations. He is now executive vice president and chief administrative officer for Wal-Mart. |

| John B. Menzer | Vice chairman, Wal-Mart, 2005 | He was one of the executives who supervised Wal-Mart's investigation into the bribery allegations. He left Wal-Mart in 2007. |
|---|---|---|
| Maritza I. Munich | General counsel of Wal-Mart International, 2005 | She helped lead Wal-Mart's investigation into the bribery allegations in Mexico. She left Wal-Mart in 2006. |
| Jose Luis Rodriguezmacedo Rivera | General Counsel of Wal-Mart de Mexico, 2005 | A target of Wal-Mart's bribery investigation, he later was given control of the investigation. He was senior vice president for legal, ethics and compliance at Wal-Mart de Mexico until he was reassigned on Friday. |
| H. Lee Scott Jr. | Chief executive of Wal-Mart, 2005 | He led a crucial meeting that resulted in the bribery investigation's being transferred to Mr. Rodríguezmacedo. Mr. Scott now sits on Wal-Mart's board of directors. |
| Kenneth H. Senser | Vice president of global security at Wal-Mart, 2005 | He helped lead the investigation into the bribery allegations. He is now a senior vice president at Wal-Mart. |
| Eduardo F. Solorzano Morales | Chief executive of Wal-Mart de Mexico, 2005 | Complained about Wal-Mart's internal investigation. He is now chief executive of Wal-Mart Latin America. |
| Lee Stucky | Chief Administrative officer of Wal-Mart International, 2005 | He was one of the executives who supervised Wal-Mart's investigation into the bribery allegations. He left Wal-Mart in 2010. |
| Juan Francisco Torres-Landa | Lawyer in Mexico City | He was hired by Wal-Mart to interview Sergio Cicero about his bribery allegations. He met Mr. Cicero three times in October 2005. |
| S. Robson Walton | Chairman of Wal-Mart | He was warned in January 2006 that Wal-Mart de Mexico real estate executives were getting kickbacks from construction companies. |

## CONDUCT ALLEGATIONS

### A.   Wal-Mart's History

38.   Wal-Mart was founded in 1962 with the opening of the first Wal-Mart discount store in Rogers, Arkansas. On October 31, 1969, the Company incorporated as Wal-Mart Stores, Inc. Wal-Mart's shares began trading on Over-the-Counter markets in 1970, and were listed on the New York Stock Exchange two years later.

39.   By the end of the decade, Wal-Mart had grown to 276 stores in 11 states. In 1983, the Company opened its first Sam's Club membership warehouse and in 1988 opened the

first supercenter -- now the Company's dominant format -- featuring a complete grocery in addition to general merchandise.

40.     Wal-Mart became an international company in 1991, when it opened its first Sam's Club near Mexico City. Wal-Mart de Mexico, or Walmex, as the company is known locally, has expanded rapidly since that time. One out of every five Wal-Mart stores is now in that country. With 2,100 stores and 209,000 employees in Mexico, it is Mexico's largest private employer. In 2011, the Walmex unit reported total sales of 379 billion pesos (\$29 billion).

41.     Wal-Mart currently operates 10,130 stores and Sam's Club locations in 27 countries, and employs 2.2 million associates, serving more than 176 million customers a year.

### B.     Corruption in Mexico

42.     Paying bribes has a long tradition in Mexico, dating back to the colonial era. The temptation to skirt red tape in Mexico has been encouraged over time by a weak justice system and the relatively low salaries of many lower-level public sector workers. Mexican police, for example, often earn well below \$1,000 a month.

43.     According to Javier Oliva, a political scientist at National Autonomous University of Mexico ("UNAM"), the payment of corporate bribes began to increase after the North American Free Trade Agreement came into force in Mexico in 1994. As Mr. Oliva told *Reuters*: "Foreign companies in the main started to look for ways of speeding up official procedures. Regrettably, this is how it works in much of Mexico." David Graham, Wal-Mart Probe Lifts Lid on Culture of Bribery in Mexico, *Reuters* (Apr. 23, 2012) (available at: http://smallbusiness.yahoo.com/advisor/wal-mart-probe-lifts-lid-culture-bribery-mexico-014522507.html).

44.     Moreover, Mexicans are used to it. A study by anti-corruption watchdog Transparencia Mexicana, the local arm of Transparency International ("TI"), showed Mexicans in 2010 paid a bribe to deal with more than one in 10 items of official paperwork or access to public services. Illicit payments cover everything from connecting a telephone line to obtaining a driver's license, and average around 165 pesos. *See id.* According to TI's director, Eduardo

Bohorquez, that figure leaps when big corporations try to operate in Mexico's capital and 31 different states, each of which has its own set of rules on how to set up a business or lease property. *See id.*

45.     Most of these bribes are paid through "gestores" (pronounced hes-TORE-ehs) or middlemen, who are used in Mexico to help companies perform a variety of tasks, from obtaining residency permits and resolving tax issues to obtaining planning authorization. While gestores can be legitimate actors in Mexico's bureaucracy, they often play starring roles in Mexico's public corruption scandals, operating in the shadows, dangling payoffs to officials of every rank.

46.     In short, paying public officials a bribe may be the quickest way to get a business growing in Mexico. Yet, it is still illegal in Mexico and the U.S.

47.     Wal-Mart executives in charge of growing Walmex were keenly aware of how to expedite building a business in Mexico, as well as the laws against bribing government officials. Nevertheless, the evidence strongly suggests that they chose to violate U.S. and Mexican law in the interest of expediency. As former Wal-Mex real estate attorney Cicero told *The New York Times*:

> [T]he payments [were] for a specific strategic purpose. The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react. Bribes, he explained, accelerated growth. They got zoning maps changed. They made environmental objections vanish. Permits that typically took months to process magically materialized in days. "What we were buying was time," he said.

David Barstow, Wal-Mart Hushed Up a Vast Mexican Bribery Case, *New York Times* (Apr. 21, 2012) (hereinafter "*Times* article").

## C.     The Red Flags and Lax Internal Controls

48.     According to the *Times* article, in 2003, Kroll Inc., a leading investigation firm, conducted a confidential investigation, for Wal-Mart. Kroll discovered that Wal-Mart de Mexico had systematically increased its sales by helping favored high-volume customers evade sales

12

taxes.

49.     A draft of Kroll's report, obtained by *The New York Times*, concluded that top Wal-Mart de Mexico executives had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags and even disregarded local press accounts asserting that Wal-Mart de Mexico was "carrying out a tax fraud." The Company ultimately paid $34.3 million in back taxes.

50.     Wal-Mart then asked Kroll to evaluate Wal-Mart de Mexico's internal audit and antifraud units. Kroll wrote another report that branded the units "ineffective." Many employees accused of wrongdoing were not even questioned; some "received a promotion shortly after the suspicions of fraudulent activities had surfaced." *Times* article.

51.     Accordingly, from at least 2003, Wal-Mart and its executives were on notice that top Wal-Mart de Mexico executives were failing to enforce their own anticorruption policies.

**D.      Walmex's Bribery Practices are Revealed**[1]

52.     On Sept. 21, 2005, Mr. Cicero sent an e-mail to Mariza I. Munich ("Munich"), then-General Counsel of Wal-Mart International, telling her he had information about "irregularities" authorized "by the highest levels" at Wal-Mart de Mexico. "I hope to meet you soon," he wrote.

53.     Ms. Munich was familiar with the challenges of avoiding corruption in Latin America. Before joining Wal-Mart in 2003, she had spent 12 years in Mexico and elsewhere in Latin America as a lawyer for Procter & Gamble.

54.     At Wal-Mart in 2004, she pushed the board to adopt a strict anticorruption policy that prohibited all employees from "offering anything of value to a government official on behalf of Wal-Mart." It required every employee to report the first sign of corruption, and it bound Wal-Mart's agents to the same exacting standards.

---

[1] Unless otherwise noted, the following Conduct Allegations are based on, and quotes taken from, the *Times* article. The *Times* article was based on, among other things, the 15 hours of interviews with Mr. Cicero, and the review of hundreds of internal Company documents.

13

55.     Ms. Munich reacted quickly to Mr. Cicero's e-mail. Within days, she hired Juan Francisco Torres-Landa ("Torres-Landa"), a prominent Harvard-trained lawyer in Mexico City, to debrief Mr. Cicero. The two men met three times in October 2005, with Ms. Munich flying in from Bentonville, Arkansas (where Wal-Mart's corporate headquarters are located) for the third debriefing.

56.     During hours of questioning, Mr. Torres-Landa's notes show, Mr. Cicero described how Wal-Mart de Mexico had perfected the art of bribery, then hidden it all with fraudulent accounting. Mr. Cicero implicated many of Wal-Mart de Mexico's leaders, including its board chairman, its general counsel, its chief auditor and its top real estate executive.

57.     But the person most responsible, he told Mr. Torres-Landa, was the Company's ambitious chief executive, Eduardo Castro-Wright, a native of Ecuador who was recruited from Honeywell in 2001 to become Wal-Mart's Chief Operating Officer in Mexico.

58.     Mr. Cicero said that while bribes were occasionally paid before Mr. Castro-Wright's arrival, their use soared after Mr. Castro-Wright ascended to the top job in 2002. Mr. Cicero described how Wal-Mart de Mexico's leaders had set "very aggressive growth goals," which required opening new stores "in record times." Wal-Mart de Mexico executives, he said, were under pressure to do "whatever was necessary" to obtain permits.

59.     In an interview with *The New York Times*, Mr. Cicero said Mr. Castro-Wright had encouraged the payments for a specific strategic purpose. The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react. Bribes, he explained, accelerated growth. They got zoning maps changed. They made environmental objections vanish. Permits that typically took months to process magically materialized in days. "What we were buying was time," he said.

60.     Wal-Mart de Mexico's stunning growth made Mr. Castro-Wright a rising star at Wal-Mart. In early 2005, when he was promoted to a senior position in the United States, Defendant Duke would cite his "outstanding results" in Mexico.

61.     Mr. Cicero's allegations were all the more startling because he implicated

14

himself. He spent hours explaining to Mr. Torres-Landa the mechanics of how he had helped funnel bribes through gestores.

62. Mr. Cicero told Mr. Torres-Landa it was his job to recruit the gestores. He worked closely with them, sharing strategies on whom to bribe. He also approved Wal-Mart de Mexico's payments to the gestores. Each payment covered the bribe and the gestor's fee, typically six percent of the bribe.

63. It was all carefully monitored through a system of secret codes known only to a handful of Wal-Mart de Mexico executives.

64. The gestores submitted invoices with brief, vaguely worded descriptions of their services. But the real story, Mr. Cicero said, was told in codes written on the invoices. The codes identified the specific "irregular act" performed, Mr. Cicero explained to Mr. Torres-Landa. One code, for example, indicated a bribe to speed up a permit. Others described bribes to obtain confidential information or eliminate fines.

65. Each month, Mr. Castro-Wright and other top Wal-Mart de Mexico executives "received a detailed schedule of all of the payments performed," he said, according to the lawyer's notes. Wal-Mart de Mexico then "purified" the bribes in accounting records as simple legal fees.

66. Mr. Torres-Landa explored Mr. Cicero's motives for coming forward.

67. Mr. Cicero said he resigned in September 2004 because he felt underappreciated. He described the "pressure and stress" of participating in years of corruption, of contending with "greedy" officials who jacked up bribe demands.

68. As he told the *Times*, "I thought I deserved a medal at least."

69. The breaking point came in early 2004, when he was passed over for the job of General Counsel of Wal-Mart de Mexico. This snub, Mr. Torres-Landa wrote, "generated significant anger with respect to the lack of recognition for his work." Mr. Cicero said he began to assemble a record of bribes he had helped orchestrate to "protect him in case of any complaint or investigation," Mr. Torres-Landa wrote.

70.     "We did not detect on his part any express statement about wishing to sell the information," the lawyer added.

71.     According to people involved in Wal-Mart's investigation, Mr. Cicero's account of criminality at the top of Wal-Mart's most important foreign subsidiary was impossible to dismiss. He had clearly been in a position to witness the events he described. Nor was this the first indication of corruption at Wal-Mart de Mexico under Mr. Castro-Wright. As discussed above, there was the 2003 Kroll investigation.

72.     None of these findings, though, had slowed Mr. Castro-Wright's rise. Just days before Mr. Cicero's first debriefing, Mr. Castro-Wright was promoted again. He was put in charge of all Wal-Mart stores in the United States, one of the most prominent jobs in the Company. He also joined Wal-Mart's executive committee, the Company's inner sanctum of leadership.

### E.     Wal-Mart's Senior Executives Take Control of the Investigatory Process and Keep Everything Inside the Company

73.     Ms. Munich sent detailed memos describing Mr. Cicero's debriefings to Wal-Mart's senior management. These executives included Thomas A. Mars, Wal-Mart's General Counsel and a former director of the Arkansas State Police; Thomas D. Hyde, Wal-Mart's Executive Vice President and Corporate Secretary; Michael Fung, Wal-Mart's top internal auditor; Craig Herkert, the chief executive for Wal-Mart's operations in Latin America; and Lee Stucky, a confidant of Lee Scott's and Chief Administrative Officer of Wal-Mart International.

74.     Wal-Mart typically hired outside law firms to lead internal investigations into allegations of significant wrongdoing. It did so earlier in 2005, for example, when Thomas M. Coughlin, then Vice Chairman of Wal-Mart, was accused of padding his expense accounts and misappropriating Wal-Mart gift cards.

75.     At first, Wal-Mart took the same approach with Mr. Cicero's allegations. It turned to Willkie Farr & Gallagher, a law firm with extensive experience in Foreign Corrupt Practices Act cases.

16

76.     Willkie Farr's "investigation work plan" called for tracing all payments to anyone who had helped Wal-Mart de Mexico obtain permits for the previous five years. The firm said it would scrutinize "any and all payments" to government officials and interview every person who might know about payoffs, including "implicated members" of Wal-Mart de Mexico's board. In short, Willkie Farr recommended the kind of independent, spare-no-expense investigation major corporations routinely undertake when confronted with allegations of serious wrongdoing by top executives.

77.     Wal-Mart's leaders rejected this approach. Instead, they decided Wal-Mart's lawyers would supervise a far more limited "preliminary inquiry" by in-house investigators. The "preliminary inquiry," a confidential memo explained, would take two weeks, not the four months Willkie Farr proposed. Rather than examining years of permits, the team would look at a few specific stores. Interviews would be done "only when absolutely essential to establishing the bona fides" of Mr. Cicero. However, if the inquiry found a "likelihood" that laws had been violated, the Company would then consider conducting a "full investigation."

78.     The decision gave Wal-Mart's senior management direct control over the investigation. It also meant new responsibility for the Company's tiny and troubled Corporate Investigations unit.

79.     The unit was ill-equipped to take on a major corruption investigation, let alone one in Mexico. It had fewer than 70 employees, and most were assigned to chasing shoplifting rings and corrupt vendors. Just four people were specifically dedicated to investigating corporate fraud, a number Joseph R. Lewis, Wal-Mart's director of corporate investigations, described in a confidential memo as "wholly inadequate for an organization the size of Wal-Mart."

80.     But Mr. Lewis and his boss, Kenneth H. Senser, vice president for global security, aviation and travel, were working to strengthen the unit. Months before Mr. Cicero surfaced, they won approval to hire four "special investigators" who, according to their job descriptions, would be assigned the "most significant and complex fraud matters." Defendant Scott, the chief executive, also agreed that Corporate Investigations would handle all allegations of misconduct

17

by senior executives.

81.    And yet in the fall of 2005, as Wal-Mart began to grapple with Mr. Cicero's allegations, two cases called into question Corporate Investigations' independence and role.

82.    In October, Wal-Mart's vice chairman, John B. Menzer, intervened in an internal investigation into a senior vice president who reported to him. According to internal records, Mr. Menzer told Mr. Senser he did not want Corporate Investigations to handle the case "due to concerns about the impact such an investigation would have." One of the senior vice president's subordinates, he said, "would be better suited to conduct this inquiry." Soon after, records show, the subordinate cleared his boss.

83.    The other case involved the president of Wal-Mart Puerto Rico. A whistle-blower had accused the president and other executives of mistreating employees. Although Corporate Investigations was supposed to investigate all allegations against senior executives, the president had instead assigned an underling to look into the complaints -- but to steer clear of those against him.

84.    In other words, there was a pattern and practice at Wal-Mart of letting senior executives oversee investigations of complaints against them and weakening the authority of the Corporate Investigations unit. Ms. Munich, Wal-Mart International's General Counsel, objected. In an e-mail to Wal-Mart executives, she complained that the investigation was "at the direction of the same company officer who is the target of several of the allegations," and that "[w]e are in need of clear guidelines about how to handle these issues going forward."

**F.    The Preliminary Inquiry: "FYI. It is Not Looking Good"**

85.    Ronald Halter, one of Wal-Mart's new "special investigators," was assigned to lead the preliminary inquiry into Mr. Cicero's allegations. Mr. Halter had been with Wal-Mart only a few months, but he was a seasoned criminal investigator, having spent 21 years at the Federal Bureau of Investigations, and he spoke Spanish.

86.    Mr. Halter also had help. Bob Ainley, a senior auditor, was sent to Mexico along with several Spanish-speaking auditors.

18

87. On November 12, 2005, Mr. Halter's team got to work at Wal-Mart de Mexico's corporate headquarters in Mexico City. The team gained access to a database of Wal-Mart de Mexico payments and began searching the payment description field for the word "gestoria."

88. By day's end, they had found 441 gestor payments. Each was a potential bribe, and yet they had searched back only to 2003.

89. Mr. Cicero had said his main gestores were Pablo Alegria Con Alonso and Jose Manuel Aguirre Juarez, obscure Mexico City lawyers with small practices who were friends of his from law school. Sure enough, Mr. Halter's team found that nearly half the payments were to Mr. Alegria and Mr. Aguirre. These two lawyers alone, records showed, had received $8.5 million in payments. Records showed Wal-Mart de Mexico routinely paid its gestores tens of thousands of dollars per permit.

90. "One very interesting postscript," Mr. Halter wrote in an e-mail to his boss, Mr. Lewis, "all payments to these individuals and all large sums of $ paid out of this account stopped abruptly in 2005." Mr. Halter said the "only thing we can find" that changed was that Mr. Castro-Wright left Wal-Mart de Mexico for the United States.

91. Mr. Halter's team confirmed detail after detail from Mr. Cicero's debriefings. Mr. Cicero had given specifics -- names, dates, bribe amounts -- for several new stores. In almost every case, investigators found documents confirming major elements of his account. And just as Mr. Cicero had described, investigators found mysterious codes at the bottom of invoices from the gestores. Notably, the documentation didn't look anything like what you would find in legitimate billing records from a legitimate law firm.

92. Mr. Lewis sent a terse progress report to his boss, Mr. Senser: "FYI. It is not looking good."

93. Hours later, Mr. Halter's team found clear confirmation that Mr. Castro-Wright and other top executives at Wal-Mart de Mexico were well aware of the gestor payments. In March 2004, the team discovered, the executives had been sent an internal Wal-Mart de Mexico audit that raised red flags about the gestor payments. The audit documented how Wal-Mart de

Mexico's two primary gestores had been paid millions to make "facilitating payments" for new store permits all over Mexico.

94.     The audit did not delve into how the money had been used to "facilitate" permits. But it showed the payments rising rapidly, roughly in line with Wal-Mart de Mexico's accelerating growth.    The audit recommended notifying Wal-Mart's senior executives in Arkansas of the payments.

95.     The recommendation, records showed, was removed by Wal-Mart de Mexico's chief auditor, whom Mr. Cicero had identified as one of the executives who knew about the bribes.    The author of the gestor audit, meanwhile, "was fired not long after the audit was completed," Mr. Halter wrote.

96.     Mr. Ainley arranged to meet the fired auditor at his hotel.    The auditor described other examples of Wal-Mart de Mexico's leaders withholding from Wal-Mart senior executives information about suspect payments to government officials.    And, the auditor singled out José Luis Rodríguezmacedo Rivera, the general counsel of Wal-Mart de Mexico.

97.     Mr. Rodríguezmacedo, he said, took "significant information out" of an audit of Wal-Mart de Mexico's compliance with the Foreign Corrupt Practices Act.    The original audit had described how Wal-Mart de Mexico gave gift cards to government officials in towns where it was building stores. "These were only given out until the construction was complete, at which time the payments ceased," Mr. Ainley wrote.

98.     These details were scrubbed from the final version of the audit sent to Wal-Mart's Arkansas headquarters.

99.     Investigators were also struck by Mr. Castro-Wright's response to the gestor audit. It had been shown to him immediately, Wal-Mart de Mexico's chief auditor had told them. Yet, rather than expressing alarm, he had appeared worried about becoming too dependent on too few gestores. In an e-mail, Mr. Rodríguezmacedo told Mr. Cicero to write up a plan to "diversify" the gestores used to "facilitate" permits, and that "Eduardo Castro wants us to implement this plan as soon as possible."

100. Mr. Cicero did as directed. The plan, which authorized paying gestores up to $280,000 to "facilitate" a single permit, was approved with a minor change. Mr. Rodríguezmacedo did not want the plan to mention "gestores." He wanted them called "external service providers."

101. Mr. Halter's team made one last discovery -- a finding that suggested the corruption might be far more extensive than even Mr. Cicero had described.

102. In going through Wal-Mart de Mexico's database of payments, investigators noticed the Company was making hefty "contributions" and "donations" directly to governments all over Mexico -- nearly $16 million in all since 2003. "Some of the payment descriptions indicate that the donation is being made for the issuance of a license," Mr. Ainley wrote in one report.

103. The investigators also found a document in which a Wal-Mart de Mexico real estate executive had openly acknowledged that "these payments were performed to facilitate obtaining the licenses or permits" for new stores. Sometimes, Mr. Cicero told *The New York Times*, donations were used hand-in-hand with gestor payments to get permits.

## G. Walmex Executives Blame the Whistleblower and Refuse to Cooperate with the Wal-Mart Investigation

104. When Mr. Halter's team was ready to interview executives at Wal-Mart de Mexico, the first target was Mr. Rodríguezmacedo. Before joining Wal-Mart de Mexico in January 2004, Mr. Rodríguezmacedo had been a lawyer for Citigroup in Mexico. Urbane and smooth, with impeccable English, he quickly won fans at Wal-Mart's corporate headquarters. When Wal-Mart invited executives from its foreign subsidiaries for several days of discussion about the fine points of the Foreign Corrupt Practices Act, Mr. Rodríguezmacedo was asked to lead one of the sessions. It was called "Overcoming Challenges in Government Dealings."

105. Yet, Mr. Cicero had identified him as a participant in the bribery scheme. In his debriefings, Mr. Cicero described how Mr. Rodríguezmacedo had passed along specific payoff instructions from Mr. Castro-Wright. In an interview with *The New York Times*, Mr. Cicero said

21

he and Mr. Rodríguezmacedo had discussed the use of gestores shortly after Mr. Rodríguezmacedo was hired. "He said, 'Don't worry. Keep it on its way.' "

106.    Mr. Halter's team hoped Mr. Rodríguezmacedo would shed light on how two outside lawyers came to be paid $8.5 million to "facilitate" permits. Mr. Rodríguezmacedo, however, responded with evasive hostility. When investigators asked him for the gestores' billing records, he said he did not have time to track them down. They got similar receptions from other executives.

107.    Only after investigators complained to higher authorities were the executives more forthcoming. Led by Mr. Rodríguezmacedo, they responded with an attack on Mr. Cicero's credibility. The gestor audit, they told investigators, had raised doubts about Mr. Cicero, since he had approved most of the payments. They began to suspect he was somehow benefiting, so they asked Kroll to investigate. It was then, they asserted, that Kroll discovered Mr. Cicero's wife was a law partner of one of the gestores.

108.    Mr. Cicero was fired, they said, because he had failed to disclose that fact. They produced a copy of a "preliminary" report from Kroll and e-mails showing the undisclosed conflict had been reported to Wal-Mart's headquarters.

109.    Based on this behavior, Mr. Rodríguezmacedo argued, the gestor payments were in all likelihood a "ruse" by Mr. Cicero to defraud Wal-Mart de Mexico. Mr. Cicero and the gestores, he contended, probably kept every last peso of the "facilitating payments."

110.    According to Mr. Rodríguezmacedo, bribes could not have been paid if the money was stolen first. But, investigators were skeptical, which records and interviews reviewed by *The New York Times* show.

111.    Indeed, there were several flaws in this argument. For example, even if Mr. Rodríguezmacedo's account were true, it did not explain why Wal-Mart de Mexico's executives had authorized gestor payments in the first place, or why they made "donations" to get permits, or why they rewrote audits to keep Wal-Mart executives in the dark.

112.    Investigators also wondered why a trained lawyer who had gotten away with

22

stealing a small fortune from Wal-Mart would now deliberately draw the Company's full attention by implicating himself in a series of fictional bribes. Moreover, if Wal-Mart de Mexico's executives truly believed they had been victimized, why hadn't they taken legal action against Mr. Cicero, much less reported the "theft" to Wal-Mart?

113.     Moreover, there was another problem. Documents contradicted most of the executives' assertions about Mr. Cicero. Records showed Mr. Cicero had not been fired, but had resigned with severance benefits and a $25,000 bonus. In fact, in a 2004 e-mail to Ms. Munich, Mr. Rodríguezmacedo himself described how he had "negotiated" Mr. Cicero's "departure." The same e-mail said Mr. Cicero had not even been confronted about the supposed undisclosed conflict involving his wife.[2] The e-mail also assured Ms. Munich there was no hint of financial wrongdoing. "We see it merely as an undisclosed conflict of interest," Mr. Rodríguezmacedo wrote.

114.     There were other discrepancies. Mr. Rodríguezmacedo said the Company had stopped using gestores after Mr. Cicero's departure. Yet even as Mr. Cicero was being debriefed in October 2005, Wal-Mart de Mexico real estate executives made a request to pay a gestor $14,000 to get a construction permit, records showed.

115.     The persistent questions and document requests from Mr. Halter's team provoked a backlash from Wal-Mart de Mexico's executives. After a week of work, Mr. Halter and other members of the team were summoned by Eduardo F. Solórzano Morales, then chief executive of Wal-Mart de Mexico.

116.     Mr. Solórzano angrily chastised the investigators for being too secretive and accusatory. He took offense that his executives were being told at the start of interviews that they had the right not to answer questions -- as if they were being read their rights.

117.     Mr. Lewis viewed the complaints as an effort to sidetrack his investigators. "I find this ludicrous and a copout for the larger concerns about what has been going on," he wrote.

---

[2] In an interview with *The New York Times*, Mr. Cicero flatly denied that his wife had ever worked with either gestor.

118.    Nevertheless, Defendant Craig Herkert, the chief executive for Latin America, was notified about the complaints. Three days later, he and his boss, Defendant Duke, flew to Mexico City. Although the trip had long been planned – Defendant Duke toured several stores – they also used the opportunity to reassure Wal-Mart de Mexico's unhappy executives. They arrived just as the investigators wrapped up their work and left.

**H.    The Preliminary Report: "There is Reasonable Suspicion to Believe That Mexican and USA Laws Have Been Violated"**

119.    Wal-Mart's leaders had agreed to consider a full investigation if the preliminary inquiry found Mr. Cicero's allegations credible. Back in Arkansas, Messrs. Halter and Ainley wrote confidential reports to Wal-Mart's top executives in December 2005, laying out all the evidence that corroborated Mr. Cicero, including the hundreds of gestor payments, the mystery codes, the rewritten audits, the evasive responses from Wal-Mart de Mexico executives, the donations for permits, the evidence gestores were still being used.

120.    "There is reasonable suspicion," Mr. Halter concluded, "to believe that Mexican and USA laws have been violated." There was simply "no defendable explanation" for the millions of dollars in gestor payments, he wrote.

121.    Mr. Halter submitted an "action plan" for a deeper investigation that would plumb the depths of corruption and culpability at Wal-Mart de Mexico. Among other things, he urged "that all efforts be concentrated on the reconstruction of Cicero's computer history."

122.    Mr. Cicero, meanwhile, was still offering help. In November, when Mr. Halter's team was in Mexico, Mr. Cicero offered his services as a paid consultant. In December, he wrote to Ms. Munich. He volunteered to share specifics on still more stores, and he promised to show her documents.

123.    Mr. Halter proposed a thorough investigation of the two main gestores. He had not tried to interview them in Mexico for fear of his safety. Now Mr. Halter wanted Wal-Mart to hire private investigators to interview and monitor both gestores. He also envisioned a round of adversarial interviews with Wal-Mart de Mexico's senior executives. He and his investigators

24

argued that it was time to take the politically sensitive step of questioning Mr. Castro-Wright about his role in the gestor payments.

124.    By January 2006, the case had reached a critical juncture. Wal-Mart's leaders were again weighing whether to approve a full investigation that would inevitably focus on a star executive already being publicly discussed as a potential successor to Mr. Scott. Wal-Mart's ethics policy offered clear direction. "Never cover up or ignore an ethics problem," the policy states. And some who were involved in the investigation argued that it was time to take a stand against signs of rising corruption in Wal-Mart's global operations. Each year the Company received hundreds of internal reports of bribery and fraud, records showed. In Asia alone, there had been 90 reports of bribery just in the previous 18 months.

125.    The situation was bad enough that Wal-Mart's top procurement executives were summoned to Bentonville that winter for a dressing down. Mr. Menzer, Wal-Mart's vice chairman, warned them that corruption was creating an unacceptable risk, particularly given the government's stepped-up enforcement of the Foreign Corrupt Practices Act. "Times have changed," he said.

126.    As if to underscore the problem, Wal-Mart's leaders were confronted with new corruption allegations at Wal-Mart de Mexico even as they pondered Mr. Halter's action plan. In January, Defendant Scott, Defendant Duke and Wal-Mart's chairman, Defendant S. Robson Walton, received an anonymous e-mail saying Wal-Mart de Mexico's top real estate executives were receiving kickbacks from construction companies. "Please you must do something," the e-mail implored.

127.    Yet at the same time, records and interviews show, there were misgivings about the budding reach and power of Corporate Investigations. In less than a year, Mr. Lewis's beefed-up team had doubled its caseload, to roughly 400 cases a year. Some executives grumbled that Mr. Lewis acted as if he still worked for the F.B.I., where he had once supervised major investigations. They accused him and his investigators of being overbearing, disruptive and naïve about the moral ambiguities of doing business abroad. They argued that Corporate

25

Investigations should focus more on quietly "neutralizing" problems than on turning corrupt employees over to law enforcement.

128.    Wal-Mart's leaders had just witnessed the downside of that approach: in early 2005, the Company went to the F.B.I. with evidence that the disgraced former vice chairman, Mr. Coughlin, had embezzled hundreds of thousands of dollars. The decision produced months of embarrassing publicity, especially when Mr. Coughlin claimed he had used the money to pay off union spies for Wal-Mart.

129.    Meanwhile, Wal-Mart de Mexico executives were continuing to complain about the investigation.

130.    In the midst of this debate, Ms. Munich submitted her resignation, effective February 1, 2006. In one of her final acts, she drafted a memo that argued for expanding the Mexico investigation and giving equal respect to Mexican and United States laws. "The bribery of government officials," she noted dryly, "is a criminal offense in Mexico."

131.    Ms. Munich also warned against allowing implicated executives to interfere with the investigation. Wal-Mart de Mexico's executives had already tried to insert themselves in the case. Just before Christmas, records show, Mr. Solórzano, the Wal-Mart de Mexico chief executive, held a video conference with Defendant Mars, Mr. Senser and Defendant Stucky to discuss his team's "hypothesis" that Mr. Cicero had stolen gestor payments.

132.    "Given the serious nature of the allegations, and the need to preserve the integrity of the investigation," Ms. Munich wrote, "it would seem more prudent to develop a follow-up plan of action, independent of Walmex management participation."

## I.    Defendant Scott Assigns Responsibility for the Investigation to One of the Accused Wrongdoers

133.    Defendant Scott called a meeting for February 3, 2006, to discuss revamping Wal-Mart's internal investigations and to resolve the question of what to do about Mr. Cicero's allegations. In the days before the meeting, records show, Mr. Senser ordered his staff to compile data showing the effectiveness of Corporate Investigations. He assembled statistics

26

showing that the unit had referred relatively few cases to law enforcement agencies.   He circulated copies of an e-mail in which Mr. Rodríguezmacedo said he had been treated "very respectfully and cordially" by Mr. Senser's investigators.

134.    Along with Mr. Scott, the meeting included Mr. Hyde, Mr. Mars and Mr. Stucky. The meeting brought the grievances against Corporate Investigations into the open.  Mr. Senser described the complaints in Mr. Lewis's performance evaluation, completed shortly after the meeting. Wal-Mart's leaders viewed Mr. Lewis's investigators as "overly aggressive," he wrote. They did not care for Mr. Lewis's "law enforcement approach," and the fact that Mr. Scott convened a meeting to express these concerns only underscored "the importance placed on these topics by senior executives."

135.    By meeting's end, Mr. Senser had been ordered to work with Mr. Mars and others to develop a "modified protocol" for internal investigations.  Mr. Scott said he wanted it done fast, and within 24 hours Mr. Senser produced a new protocol, a highly bureaucratic process that gave senior Wal-Mart executives – including executives at the business units being investigated – more control over internal investigations.  The policy included multiple "case reviews."  It also required senior executives to conduct a "cost-benefit analysis" before signing off on a full-blown investigation.

136.    Under the new protocol, Mr. Lewis and his team would only investigate "significant" allegations, like those involving potential crimes or top executives.   Lesser allegations would be left to the affected business unit to investigate.

137.    Four days after Defendant Scott's meeting, with the new protocol drafted, Wal-Mart's leaders began to transfer control of the bribery investigation to one of its earliest targets, Defendant Rodríguezmacedo.

138.    Defendant Mars first sent Mr. Halter's report to Defendant Rodríguezmacedo. Then he arranged to ship Mr. Halter's investigative files that revealed criminal activity from the U.S. to Mexico.  In an e-mail, he sought Mr. Senser's advice on how to send the files in "a secure manner."   Mr. Senser recommended FedEx.   "There is very good control on those

shipments, and while governments do compromise them if they are looking for something in particular, there is no reason for them to think that this shipment is out of the ordinary," he wrote. "The key," he added, "is being careful about how you communicate the details of the shipment to José Luis." He advised Defendant Mars to use encrypted e-mail.

139.    When contacted by *The New York Times*, Wal-Mart's spokesman, Mr. Tovar, said the company could not discuss Defendant Scott's meeting or the decision to transfer the case to Defendant Rodríguezmacedo. "At this point," he said, "we don't have a full explanation of what happened. Unfortunately, we realize that until the investigation is concluded, there will be some unanswered questions."

140.    Wal-Mart's leaders, however, had clear guidance about the propriety of letting a target of an investigation run it. On the same day Mr. Senser was putting the finishing touches on the new investigations protocol, Wal-Mart's ethics office sent him a booklet of "best practices" for internal investigations. It had been put together by lawyers and executives who supervised investigations at Fortune 500 companies, and stated that: "[i]nvestigations should be conducted by individuals who do not have any vested interest in the potential outcomes of the investigation."

141.    Moreover, the transfer appeared to violate even the "modified protocol" for investigations. Under the new protocol, Corporate Investigations was still supposed to handle "significant" allegations -- including those involving potential crimes and senior executives. When Mr. Senser asked his deputies to list all investigations that met this threshold, they came up with 31 cases. At the top of the list: Mexico.

142.    After the meeting with Mr. Scott, Mr. Senser had told Mr. Lewis in his performance evaluation that his "highest priority" should be to eliminate "the perceptions that investigators are being too aggressive." He wanted Mr. Lewis to "earn the trust of" his "clients" – Wal-Mart's leaders. He wanted him to head off "adversarial interactions."

**J.      The Final Report is Written By One of the Targets of the Investigation**

143.    For those who had investigated Mr. Cicero's allegations, the preliminary inquiry

28

had been just that – preliminary. In memos and meetings, they had argued that their findings clearly justified a full-blown investigation. Defendant Castro-Wright's precise role had yet to be determined. Mr. Halter had never been permitted to question him, nor had Defendant Castro-Wright's computer files been examined, records and interviews show. At the very least, a complete investigation would take months.

144. Defendant Rodríguezmacedo, the man now in charge and one of the targets of the investigation, saw it differently. He wrapped up the case in a few weeks, with little additional investigation.

145. "There is no evidence or clear indication," his report concluded, "of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits." That conclusion, his report explained, was largely based on the denials of his fellow executives. Not one "mentioned having ordered or given bribes to government authorities," he wrote.

146. His report, a mere six pages long, neglected to note that he had been implicated in the same criminal conduct. That was not, however, the only omission. While his report conceded that Wal-Mart de Mexico executives had authorized years of payments to gestores, it never explained what these executives expected the gestores to do with the millions of dollars they received to "facilitate" permits.

147. He was also silent on the evidence that Wal-Mart de Mexico had doled out donations to get permits. Nor did he address evidence that he and other executives had suppressed or rewritten audits that would have alerted Wal-Mart senior executives to improper payments.

148. Instead, the bulk of Defendant Rodríguezmacedo's report attacked the integrity of his accuser. Mr. Cicero, he wrote, made Wal-Mart de Mexico's executives think they would "run the risk of having permits denied if the gestores were not used." But this was merely a ruse: In all likelihood, he argued, Wal-Mart de Mexico paid millions for "services never rendered." The gestores simply pocketed the money, he suggested, and Mr. Cicero "may have benefited,"

too.

149.    Defendant Rodríguezmacedo, however, offered no direct proof. Indeed, as his report made clear, it was less an allegation than a hypothesis built on two highly circumstantial pillars.

150.    First, he said he had consulted with Jesús Zamora-Pierce, a "prestigious independent counsel" who had written books on fraud. Mr. Zamora, he wrote, "feels the conduct displayed by Sergio Cicero is typical of someone engaging in fraud. It is not uncommon in Mexico for lawyers to recommend the use of gestores to facilitate permit obtainment, when in reality it is nothing more than a means of engaging in fraud."

151.    Second, he said he had done a statistical analysis that found Wal-Mart de Mexico won permits even faster after Mr. Cicero left. The validity of his analysis was impossible to assess; he did not include his statistics in the report.

152.    In building a case against Mr. Cicero, Mr. Rodríguezmacedo's report included several false statements. He described Mr. Cicero's "dismissal" when records showed he had resigned. He also wrote that Kroll's investigation of Mr. Cicero concluded that he "had a considerable increase in his standard of living during the time in which payments were made to the gestores." The Kroll report, however, made no such assertion.

153.    His report promised a series of corrective steps aimed at putting the entire matter to rest. Wal-Mart de Mexico would no longer use gestores. There would be a renewed commitment to Wal-Mart's anticorruption policy. He did not recommend any disciplinary action against his colleagues.

154.    There was, however, one person he hoped to punish. Wal-Mart de Mexico, he wrote, would scour Mr. Cicero's records and determine "if any legal action may be taken against him." Defendant Rodríguezmacedo submitted a draft of his report to Bentonville.

155.    In an e-mail, Mr. Lewis told his superiors that he found the report "lacking." It was not clear what evidence supported the report's conclusions, he wrote. "More importantly," he wrote, "if one agrees that Sergio defrauded the company and I am one of them, the question

becomes, how was he able to get away with almost $10 million and why was nothing done after it was discovered?"

156.    Defendant Rodríguezmacedo responded by adding a paragraph to the end of his report: They had decided not to pursue "criminal actions" against Mr. Cicero because "we did not have a strong case."

157.    "At the risk of being cynical," Mr. Lewis wrote in response, "that report is exactly the same as the previous which I indicated was truly lacking."

158.    But it was enough for Wal-Mart and its management.    On May 10, 2006, Defendant Rodríguezmacedo was told by senior Wal-Mart executives, to put his report "into final form, thus concluding this investigation."

## K.    *The New York Times* Tells Wal-Mart it is Investigating Mr. Cicero's Claims and the Cover Up Unravels

159.    For many years Wal-Mart was able to keep the bribes and subsequent whitewashing under wraps. The wrongdoers, including some of the Defendants, kept their jobs and, in many cases, were promoted. This was not, however, the end of the story.

160.    In December 2011, after learning of *The New York Times'* investigation, Wal-Mart informed the Justice Department and SEC that it had begun an internal investigation into possible violations of the Foreign Corrupt Practices Act.

161.    And, on December 8, 2011, the Company filed with the SEC a 10-Q stating:

> During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program. As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act. The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures. The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission. We cannot reasonably estimate the potential liability, if any, related to these matters. However, based on the facts currently known, we do not believe that these matters

31

> will have a material adverse effect on our business, financial
> condition, results of operations or cash flows.

162.    Although the statement was vaguely worded, a Wal-Mart spokesman confirmed to *The New York Times* that the Company's Mexico operations – and its handling of the 2005 case – were now a major focus of its inquiry.

163.    The SEC has not commented on its investigation; however, according to some experts, the SEC will be particularly interested in the Company's current executive leadership and whether they made any serious material omissions in their Sarbanes-Oxley Act certifications during the 2005 time period. As Michael Koehler, a Butler University business law professor who writes the popular FCPA Professor blog, recently stated: "[i]f you knew that one of your highest-profile subsidiaries had problematic conduct, but you made SOX certifications that the company had effective internal controls and everything was fine there, that could easily be an area of liability for current executives." Todd Ruger, Will Wal-Mart Regret Not Disclosing Its Bribery Investigation Sooner?, *CorpCounsel*, (Apr. 2012) (available at: http://www.law.com/jsp/cc/PubArticleCC.jsp?id=1202549958532&thepage=2).

164.    Wal-Mart also faces an investigation in Mexico. On April 25, 2012, *Reuters* reported that: "Mexico's federal comptroller's office said ... it would open an investigation into allegations that the Mexican unit of Wal-Mart Stores Inc. bribed officials to expand its business in Mexico." Dave Graham, Mexico Says to Open Probe Into Wal-Mart Allegations, *Reuters*, (Apr. 25, 2012) (available at: http://finance.yahoo.com/news/mexico-says-open-probe-wal-201814797.html).

**L.    *The New York Times* Breaks the Story**

165.    On April 21, 2012, after months of investigation, *The New York Times* published an article by Pulitzer Prize winning journalist David Barstow entitled *Wal-Mart Hushed Up a Vast Mexican Bribery Case*. As discussed above, the *Times* article was based on, among other things, 15 hours of interviews with Mr. Cicero, and the review of hundreds of internal Company documents.

32

166.    On the first two days of trading after publication of the *Times* article, Wal-Mart
stock was pummeled, falling $4.68 – from a close of $62.45 on Friday April 20, 2012, to a close
of $57.77 on Tuesday April 24, 2012. This equated to a market capitalization loss of over $10
billion.

167.    The *Times* article sparked the publication of dozens of other articles, many of
which focused on the damage sustained by the Company, as well as the possible imposition of
civil and criminal penalties against individuals and the Company.

## DAMAGES ALLEGATIONS

168.    As a direct and proximate result of the Individual Defendants' wrongdoing, Wal-
Mart has suffered, and will continue to suffer a myriad of damages.

169.    The Individual Defendants' actions have, for example, caused Wal-Mart to suffer
reputational damages. As Yale School of Management corporate governance expert Jeffrey
Sonnenfeld told MSNBC: "The Wal-Mart allegations will undoubtedly leave a black mark on the
company's name." Roland Jones, *Wal-Mart Bribery Allegations Could Have Far-reaching
Impact*, Market Day on MSNBC.COM (Apr. 23, 2012)
(http://marketday.msnbc.msn.com/_news/2012/04/23/11350733-wal-mart-bribery-allegations-
could-have-far-reaching-impact?chromedomain=bottomline last visited Apr. 23, 2012).

170.    According to Professor Sonnenfeld: "'A company's reputation is worth a lot. …
Great companies in the past – Johnson and Johnson, UPS – they know there's a great value in
having this sense of cleanliness and a reputation that stands for something beyond what you
think you can get away with.'" *Id.*

171.    Moreover, reputational damages can carry very real costs. As BMO Capital
Markets analyst Wayne Hood said in a research note published on April 23, 2012, allegations
like these could hamper the discount chain's future growth both domestically and abroad:
"Articles like this will be used against the company by activists and competitors when it attempts
to open stores in the U.S. and abroad." *Id.*.

172.    In fact, the reaction to the accusations against Wal-Mart executives is already

hurting the Company, including in New York City, a market the Company has been trying to penetrate for years. On the same day the story broke, New York City's Public Advocate Bill de Blasio released a statement blasting the Company: "New York City cannot open its doors to a company that sanctions bribery and then covers it up as a part of doing business...New Yorkers should be put on notice: there is no tactic too underhanded for Wal-Mart to try in order to open here."

173.    Similarly, Manhattan Borough President Scott Stringer stated: "Once again Wal-Mart has shown itself to be a bad corporate actor and a bad neighbor, a company whose black marks already include predatory pricing and blatant disregard for the rights of working men and women."

174.    An FCPA investigation can also cost a company hundreds of millions of dollars in legal fees and fines, as well as years of wasted executive time in dealing with the allegations and clean-up of the wrongful conduct. Legal fees for the Company and its directors in this type of investigation can grow quickly. For instance, Avon has disclosed it was spending $95 million in 2010 dealing with a Foreign Corrupt Practices Act investigation that has been going on since 2008, and in 2008 Siemens AG, the electronics and electrical engineering company, paid a $450 million fine to resolve FCPA claims.

175.    In addition to huge legal costs and fines, the culture of corruption fostered by the Individual Defendants may also lead to criminal prosecutions. According to an article on MSNBC.COM:

> "We could easily see criminal prosecutions," said Jacob Frenkel, a former official of the Securities and Exchange Commission.
>
> "The fact that it's a U.S. company working through a Mexican subsidiary does not give the U.S. company protection," Frenkel told CNBC, adding that anyone who is found to have their fingerprints on the alleged wrongdoings "has potential liability, civilly and criminally."
>
> Frenkel said he wouldn't rule out potential jail time for Wal-Mart executives and estimated that the financial consequences of the *Times* report, if accurate, could cost Wal-Mart $1 billion in settlements and internal investigations.

34

Roland Jones, Wal-Mart Bribery Allegations Could Have Far-reaching Impact, Market Day on MSNBC.COM (Apr. 23, 2012).

176. The fact that Wal-Mart chose to cover up the wrongdoing, instead of coming forward, will only increase the potential penalties. As one FCPA expert told *The Wall Street Journal*:

> If federal authorities conclude that Wal-Mart violated the law, the Justice Department "will levy as large a fine as possible in a case like this, because it has repeatedly counseled companies that companies will be looked on with great favor if they do come forward," said Kevin T. Abikoff, chairman of the anti-corruption practice at law firm Hughes Hubbard & Reed LLP. "You either pay a small price early or a huge amount later."

Miguel Bustillo, Wal-Mart Faces Risk in Mexican Bribe Probe, *The Wall Street Journal* (Apr. 23, 2012).

177. The same applies to the potential for jail time: "If federal investigators found any evidence of a cover-up, they could bring criminal charges against individual executives at the company." Miguel Bustillo, Wal-Mart Faces Risk in Mexican Bribe Probe, *The Wall Street Journal* (Apr. 23, 2012).

178. In terms of additional immediate damages, the Company has admitted that it has already met with the United States Department of Justice ("DOJ") and the United States Securities and Exchange Commission ("SEC") to "self-disclose" the ongoing investigation of this matter, and that it has retained outside legal and accounting experts to conduct an internal investigation. Accordingly, Wal-Mart is now incurring significant monetary costs in dealing with an investigation that experts estimate will take "two to four years." Miguel Bustillo, Wal-Mart Faces Risk in Mexican Bribe Probe, *The Wall Street Journal* (Apr. 23, 2012).

179. Damage to the Company may also extend to Wal-Mart's political relations, both here and abroad. On April 23, 2012, two Democratic U.S. lawmakers, Elijah Cummings and Henry Waxman, said they were launching an investigation into the matter and sent a letter to Defendant Duke requesting a meeting.

180.    On that same day, Consumer Edge Research analyst Faye Landes acknowledged potential damage to Wal-Mart's overseas expansion plans. Ms. Landes wrote in a research note: "Entering additional countries is a cornerstone of Wal-Mart's growth strategy," and "[w]e can foresee the authorities in some key countries, notably India, becoming dramatically less welcoming to Wal-Mart following the release of the allegations."

181.    On April 23, 2012, *The Washington Post* reported that the DOJ has been conducting a criminal probe of Wal-Mart for allegations of systematic bribery in Mexico. According to the *Washington Post*, "the probe was launched in December 2011, and is continuing."

182.    The Company also faces investigations in Mexico.  On April 23, 2012, the Federal comptroller – the government's anti-corruption watchdog, announced that it would begin an investigation, including, but not limited to, a review of the permits granted to the Company by the environmental ministry.

183.    On April 26, 2012, *The New York Times* reported that Mexico's Attorney General would begin an investigation of Wal-Mart and Walmex: "The investigators will gather evidence about the company's executives as well as public officials."

## ALLEGATIONS RELATING TO DEFENDANTS' DUTIES

184.    Each Defendant, as a current or former director and/or officer of Wal-Mart, in carrying out their managerial roles is charged with an unyielding fiduciary duty to the corporation and its stockholders.  This duty encompasses the fiduciary obligations of trust, loyalty, good faith and candor.  In carrying out his or her duties each director and/or officer must use his or her utmost ability to control and manage the Company in a fair, just, honest, and equitable manner, and cannot take any action or inaction with regard to the Company that lacks good faith, no matter what the provocation.

185.    The Company's bylaws, articles of incorporation, as well as Board Committee charters, specifically set forth the duties and obligations that Board members are required to fulfill on behalf of the Company.

186.    For example, the Company's Corporate Governance Guidelines require Directors to: "review compliance with applicable laws and regulations and adopt policies of corporate conduct to assure compliance with applicable laws and regulations." Corporate Governance Guidelines, ¶2. Each director is also required to familiarize himself or herself with "[the Company's] compliance programs, and its Statement of Ethics." Corporate Governance Guidelines, ¶6.

187.    The Statement of Ethics, by its terms applies to "all members of the board of directors of Wal-Mart Stores, Inc. . . . and to directors of all Wal-Mart-controlled subsidiaries."

188.    The Board is also required to act consistently with Wal-Mart's Code of Business Conduct and Ethics (the "Conduct and Ethics Code"). Moreover, the Board is required to itself act in compliance with the law. As Chief Chancellor Strine recently stated: "Delaware law does not charter law breakers. Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.' As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." *In re Massey Energy Co.*, No. 5430-VCS, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011).

189.    The Conduct and Ethics Code sets forth specific mandates regarding payments of money or anything of value to foreign officials. It provides among other things as follows: "We do not tolerate, permit or engage in bribery, corruption, or unethical practices of any kind. Bribery of public officials in the U.S. and abroad is illegal under both U.S. law and the local law of the countries in which we operate. Walmart's policy goes beyond these legal requirements and prohibits corrupt payments in all circumstances, whether in dealings with public officials or individuals in the private sector."

190.    Wal-Mart's Proxy statements dated 4/15/2007, 4/15/2006 and 4/15/2005 that reflect events from Feb. 1, 2006 through Jan. 31, 2007, Feb. 1, 2005 through Jan. 31, 2006, and Feb. 1, 2004 through Jan. 31, 2005 respectively, show there were five standing committees of the

37

Board at that time: (1) Audit Committee; (2) Strategic Planning and Finance Committee: (3) Compensation, Nominating and Governance Committee; (4) Executive Committee; and (5) Stock Options Committee. All committees were required to report regularly to the full Board.

191. The Audit Committee Charter, whose charter has not changed in any meaningful way since 2005, states that "management of the Company, under the oversight of the Audit Committee and the Board to *assure compliance by the Company with applicable legal and regulatory requirements*." (emphasis added). The Audit Committee is further responsible for overseeing risk assessment and risk management process and policies. The Audit Committee charter states the Audit Committee is required to "review and discuss with management . . . the Company's major financial and other risk exposures and the steps management has taken to monitor and control such exposures." Moreover, according to its charter, the Audit Committee is further required to "discuss with management and the Outside Auditor, and advise the Board with respect to, the Company's policies, processes and procedures regarding compliance with applicable laws and regulations and *the Statement of Ethics, and instances of non-compliance therewith*." (emphasis added).

192. The Strategic Planning and Finance Committee ("Strategic Planning") Charter grants the committee members specific oversight responsibility with respect to the strategic planning functions of the corporation, such as the proliferation of Wal-Mart stores, banks and restaurants in Mexico at breakneck speed resulting in Wal-Mart becoming the single largest employer in the country. Specifically, the Strategic Planning Committee Charter gives its committee members "authority and responsibilities to: (1) provide input from the Board to management in the development of the Company's strategic plan; (2) serve as a resource in assisting management in the development of the Company's strategic plan; (3) act in an advisory capacity in assessing the strategies and action plans designed to meet the Company's strategic objectives; and (4) serve as representatives of the Board in evaluating the Company's strategic planning process." These provisions have remained the same from 2005 until the present. It was incumbent on Board members serving on the Strategic Planning Committee to probe the

Company's strategy for fast-paced expansion into Mexico and ensure that the Company's strategy to win market dominance in Mexico was accomplished in a lawful manner.

193. The Compensation, Nominating and Governance Committee Charter gives the committee members responsibility to "review the performance of the Board and Company management" and to "develop and recommend to the Board corporate governance principles." Specifically these committee members were given "the following authority and responsibilities: . . . with respect to the CEO, the Chairman or Chairwoman of the Board, and other associates who are directors of the Company ('Inside Directors'), annually review and approve corporate goals and objectives relevant to their compensation, evaluate their performance in light of those goals and objectives and set their compensation accordingly." It was within the purview of these committee members' direct responsibilities to evaluate whether the CEO at that time, Defendant Scott, was performing one of the core duties – complying with the law. Had they performed this responsibility in a faithful and loyal manner, they would have uncovered Defendant Scott's unlawful interference with the 2005-2006 investigation into widespread bribery in Mexico.

194. Another duty of the committee members on the Compensation, Nominating and Governance Committee specifically set forth in the Committee charter is to " review and assess the Company's compliance with the corporate governance requirements established by the New York Stock Exchange, the requirements established under the Sarbanes-Oxley Act and other applicable corporate governance laws and regulations." Had the committee members performed this responsibility in a faithful and loyal manner, they would have established a process for reviewing the Company's compliance with the FCPA, particularly since the SEC and the Department of Justice were very public in announcing their intention to ramp up enforcement of this law.

195. An additional duty of the committee members on the Compensation, Nominating and Governance Committee specifically set forth in the Committee charter is to "develop procedures for and conduct the annual review of the performance of the Board, and report annually to the Board with an assessment of the Board's performance." Had the committee

members faithfully and loyally discharged their responsibility, they would have uncovered the failure of various committees and the Board as a whole to oversee the Company's compliance with the FCPA and other laws.

## CURRENT AND PAST MEMBERSHIP OF RELEVANT BOARD COMMITTEES

196. The following chart illustrates each of the Defendants' membership on the relevant committees of Wal-Mart's Board by fiscal year:[3]

| Director | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|
| James W. Breyer | SPFC* | SPFC* | SPFC* | SPFC* | SPFC* | SPFC* | SPFC* | SPFC* (Chair until 6/3/11) |
| M. Michele Burns | AUD | AUD* | AUD (until 2/20/06) CNGC* (as of 3/2/06) | CNGC (until 6/1/07) SPFC (as of 6/1/07) | SPFC | SPFC | SPFC | SPFC* (Chair as of 6/3/11) |
| Roger C. Corbett | | | SPFC | SPFC | SPFC | SPFC | SPFC | SPFC |
| Douglas N. Daft | CNGC | CNGC | CNGC | CNGC | CNGC | CNGC | CNGC | CNGC |
| Michael T. Duke | | | | EXEC | EXEC (as of 11/20/08) | EXEC | EXEC | EXEC* |
| H. Lee Scott, Jr. | EXEC | EXEC | EXEC* | EXEC* | EXEC* | EXEC* | EXEC* SPFC (as of 6/4/10) | SPFC |
| Jim C. Walton | | SPFC (began 9/28/05) | SPFC | SPFC | SPFC | SPFC | SPFC | SPFC |
| S. Robson Walton | EXEC | EXEC | EXEC | EXEC | EXEC | EXEC | EXEC | EXEC |
| Christopher J. Williams | | AUD | AUD EXEC (as of 6/2/06) | AUD* EXEC | AUD* EXEC | AUD* EXEC | AUD* | AUD EXEC |
| Linda S. Wolf | | CNGC | CNGC | CNGC * | CNGC* | CNGC * | CNGC * | CNGC* |
| James I. Cash, Jr. | | | AUD (as of 6/2/06) | AUD | AUD | AUD | AUD | AUD |

[3] In the chart, the following applies: (1) "AUD" means the Audit Committee; (2) "SPFC" means the Strategic Planning and Finance Committee; (3) "CNGC" means the Compensation, Nominating and Governance Committee; "EXEC" means the Executive Committee; and (5) "*" denotes a Board committee chairperson. Additionally, a fiscal year ends on January 31, such that fiscal year 2006 runs from February 1, 2005 to January 31, 2006.

| Director | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|
| Aida M. Alvarez | | | SPFC (as of 6/2/06) | AUD* (as of 6/1/07) SPFC (until 6/1/07) | AUD | AUD | AUD | AUD |
| Arne M. Sorenson | | | | | AUD | AUD | AUD | AUD |
| Gregory B. Penner | | | | | SPFC | | | |
| Steven S. Reinemund | | | | | | | CNGC (as of 6/4/10) | CNGC |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

197. Plaintiff was a shareholder at the time of the conduct complained of herein and has continuously held shares of Wal-Mart to the present. Plaintiff will continue to be a shareholder of Wal-Mart throughout the pendency of this action. Plaintiff will adequately and fairly represent the interests of Wal-Mart and its shareholders in enforcing its rights.

198. Plaintiff has not made a demand on the Board to institute this action because such a demand would be a futile, wasteful and useless act. Wal-Mart's current Board consists of 15 members each of whom has been named as a Defendant in this action. Of the 15 members, nine members, including Defendants Scott, Duke, S. Robson Walton, Jim Walton, Breyer, Burns, Daft, Williams and Wolf, either sat on the Wal-Mart Board and/or served as a high-ranking executive officer, and knew about the wrongful conduct described herein at the time it was occurring and did nothing to correct it. Each of these current directors (a majority of the current 15-member Board of Directors), faces a substantial likelihood of liability for allowing Wal-Mart to violate the FCPA in its Mexican operation, even if that director lacked actual knowledge that any bribe was paid. To establish criminal liability under the FCPA, the Department of Justice need prove only that the director had a "high probability" that bribes were being paid in Mexico but "consciously and intentionally avoided confirming that fact." *See United States v. Kozeny*, 667 F.3d 122, 132 (2d. Cir. 2011). Given the exponential growth of Wal-Mart's operations in Mexico, the Defendants' knowledge of the inadequacy of Wal-Mart's guidelines to ensure compliance with anti-bribery policy, and their refusal to take measures to shore up those known

inadequate internal controls, the recent instances of sabotage of internal investigations by high level executives (see *infra* at ¶¶82, 83), and the common knowledge that bribery is a frequent occurrence in Mexico, there is a substantial likelihood that the Department of Justice will conclude that the nine director Defendants believed that bribes were probably being paid in Mexico but "consciously and intentionally avoided confirming that fact."

199.    Additionally, demand is futile because a majority of the current Board is not disinterested or not independent.

**H. Lee Scott Jr.**

200.    Defendant Scott has served on the Board of Directors since 1999 and was Wal-Mart's President and Chief Executive Officer from January 2000 to January 2009. Defendant Scott is disabled from deciding a demand because he was integrally involved in the wrongful activity described in this Complaint. Defendant Scott knew about the widespread bribery at the highest levels of Wal-Mart de Mexico and instead of rooting out the wrongdoing, he proceeded to squelch the investigation and bury the results. On or about February 3, 2006 Defendant Scott met with Wal-Mart's internal Corporate Investigations unit, pretextually accused the investigators of being overly aggressive, ordered them to redraft a protocol for a more limited investigation and allowed the investigation to be directed by Defendant Rodriguezmacedo, a primary target of the investigation. Once the investigation overseen by a target concluded, not surprisingly, with a finding of "no wrongdoing," Defendant Scott authorized the investigation to be closed and the wrongdoing to be covered up for the succeeding six years. Defendant Scott faces a strong likelihood of civil and criminal liability under the anti-bribery sections of the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§78dd-1, *et seq*. ("FCPA") and other laws and thus is disqualified from deciding a demand.

**Michael T. Duke**

201.    Defendant Duke has served on the Wal-Mart Board of Directors since 2008 and was employed by Wal-Mart since 1995. In the 2005-2006 period Defendant Duke's position was Vice Chairman of the International Division and he was charged with overseeing

international operations, including those in Mexico. Defendant Duke is disabled from deciding a demand because he was one of the primary wrongdoers. He was made expressly aware of the details of the allegations of rampant bribery throughout Mexico by the highest executive level of Wal-Mart de Mexico and suppressed any meaningful investigation into such unlawful practices. He then participated in covering it up for the next six years. Defendant Duke faces a substantial likelihood of liability under the anti-bribery sections of the FCPA and other laws and thus is disqualified from deciding a demand. Moreover, Defendant Duke, who as Wal-Mart's current CEO earns over $18 million dollars per year, has strong financial incentives not to pursue an action against himself.

## S. Robson Walton

202. Defendant S. Robson Walton is a son of founder Sam Walton and has served on the Board continuously since 1978. He knew that serious corruption and bribery was almost certainly occurring in Wal-Mart de Mexico by early 2006 at the latest. Along with Defendants Scott and Duke, Defendant S. Robson Walton received an anonymous email stating that Wal-Mart de Mexico's top real estate executives were receiving kickbacks from construction companies. Although the e-mail sender begged Defendant S. Robson Walton "please you must do something," Defendant S. Robson Walton suppressed the email and did nothing to investigate the wrongdoing, despite his position of authority on the Board. As such, Defendant S. Robson Walton faces a substantial likelihood of civil and criminal liability under the anti-bribery sections of the FCPA, and other laws and thus is disqualified from deciding a demand. Additionally, Defendant S. Robson Walton is the brother of Defendant Jim Walton and is the father-in-law of Defendant Penner. These familial ties disqualify him from considering demand.

## Jim C. Walton

203. Defendant Jim Walton served on the Board since 2005. He is the son of the founder of the Company, Sam Walton, and younger brother of co-Defendant S. Robson Walton. A brother, especially in a close family with intertwined business relationships comprising great wealth, is disabled from making a decision on a shareholder demand that exposes his brother and

his brother's son-in-law to a substantial likelihood of civil or criminal liability.

## Gregory Penner

204.    Defendant Gregory Penner is married to Carrie Walton, the daughter of S. Robson Walton and granddaughter of founder Sam Walton. From 2002 to 2004 Defendant Penner was the Senior Vice President and Chief Financial Officer at Wal-Mart. From 2000 to 2002 Defendant Penner was Senior Vice President of Finance and Strategy for Wal-Mart.com. Defendant Penner, who comes from a middle class background (his father is a practicing psychologist and his mother a nurse), lives a very lavish lifestyle with his wife and four children that is due to the wealth of the Walton family. A son-in-law, who is dependent on his wife's family's wealth, is disabled from making a decision on a shareholder demand that exposes his father-in-law and fellow Board member to a substantial likelihood of civil or criminal liability.

## M. Michele Burns, Douglas N. Daft, Christopher J. Williams and Linda S. Wolf

205.    Each of the above directors sat on the Board in the 2005 to 2006 period, serving on various committees, and each of these long-standing Board Members intentionally and in bad faith overlooked numerous warning signs indicating that the highest levels of executives at the Company, including some of their own Board members, in violation of civil and criminal laws of the United States and Mexico and the Company's own internal Code of Conduct, interfered with and killed a sensitive investigation into criminal corruption at the highest levels of Wal-Mart de Mexico and then covered up the criminality uncovered by the investigation. As described herein, each of the 2005-2006 Board Members were intimately familiar with the inadequacy of the Company's enforcement of internal whistleblower guidelines and refused to shore up this inadequacy. They also were particularly focused on the Company's "Mexico success story" and either knew or consciously disregarded that the Company's fast-paced domination of the Mexican market was accomplished by breaking various laws in Mexico and the U.S.

## Well-Known History of Ineffective Internal Guidelines and Fast and Loose Manipulation of Investigations by High Level Executives

206.    The widespread publicity in the main-line press generated from the *Dukes v. Wal-*

*Mart* class certification decision in June 2004 made the ethics and law abiding policies of Wal-Mart a topic of common knowledge.

207.    On January 24, 2005 Vice Chairman of the Wal-Mart Board, Thomas Coughlin, retired in disgrace from his executive position at Wal-Mart and resigned from his Board position effective March 2005.  The investigation into Vice Chairman Coughlin's wrongdoing revealed that he filed false invoices, embezzled from the Company and possibly paid bribes to trade union officials not to organize at Wal-Mart locations.  Coughlin ultimately pled guilty to five counts of wire fraud and one count of filing a false income tax return related to the embezzlement during the time he sat on the Wal-Mart Board of Directors.  Defendants Breyer, Burns, Daft, Williams and Wolf each sat on the Board during the entire Coughlin incident.

208.    One week after Coughlin was fired, Jared Bowen, the vice president who tipped off the Board about Coughlin's embezzlement and possible bribes, was himself fired.  The Wall Street Journal reported the reason for Bowen's firing was "loss of confidence in associate as a company officer."  In April 2005, while Burns sat on the Audit Committee, Daft sat on the Compensation, Nominating and Governance Committee, Bowen in a highly visible and widely reported manner asked a federal prosecutor to investigate whether Wal-Mart violated a U.S. Department of Justice Mandate, the Thompson Memorandum, a guideline for prosecutors in assessing corporate liability for internal missteps.  One gauge of liability is whether the company has an effective compliance program encouraging workers to sound the alarm on wrongdoing.

209.    None of the Defendants sitting on the Board at the time did anything in response to Bowen's charge to remedy Wal-Mart's compliance program or manner of conducting internal investigations to assure the truth is revealed.  April 2005 was only five months before Mr. Cicero, the whistleblower in the Mexican bribery scandal made his allegations.

210.    In October 2005, only one month after Mr. Cicero contacted Wal-Mart headquarters to report high-level and extensive bribery in Mexico, John Menzer, Vice President of Wal-Mart International was telling the head of Wal-Mart's Corporate Investigation Unit, Mr. Senser to back off any internal investigation of Menzer's subordinates.  (*See* ¶ 82).  Also around

the same time Corporate Investigations was ordered by a Wal-Mart President in Puerto Rico to stand down on an investigation into senior executive wrongdoing. (*See* ¶ 83).

**Wal-Mart Board Turns a Deaf Ear to Investors' Complaints of Lack of Internal Controls Over Investigations and Unlawful Conduct**

211.   On May 25, 2005 three savvy and highly respected representatives of institutional investors -- New York City Comptroller, William C. Thompson, Jr., Chairman of the Illinois State Board of Investment, Edward M. Smith, and Director of Governance and Socially Responsible Investment, F&C Asset Management plc Karina Litvack -- whose clients collectively owned nearly 11.5 million Wal-Mart shares valued at nearly $550 million -- sent a letter to the chair of the Wal-Mart Audit Committee expressing their grave concerns about Wal-Mart's lack of effective internal controls over legal and regulatory compliance. Their letter stated:

> We are writing to voice our serious concerns about reports of legal and regulatory non-compliance at Wal-Mart.
>
> * * *
>
> While the Audit Committee has disclosed that Wal-Mart has adequate internal controls over financial reporting, recent reports of legal and regulatory non-compliance raise serious concerns about the adequacy of the company's controls.
>
> * * *
>
> The frequency of the reports suggests that non-compliance with internal standards, as well as with laws and regulations, may be far too commonplace at Wal-Mart.

212.   Thompson, Smith and Litvack demanded the Audit Committee appoint a "special committee of independent directors to conduct a thorough review of the company's controls." At this time, just three months before Mr. Cicero blew the whistle on the Mexican bribery scandal, both Defendant Burns and Defendant Williams served on the Audit Committee. The Audit Committee charter required the Board Members who served on that Committee to, among other things: "review the Company's policies, processes, and procedures regarding compliance with applicable laws and regulations and the Statement of Ethics. (2005 Proxy p. 8). The Statement

of Ethics, among other things, prohibited any employee or director from making bribes or interfering with a lawful investigation.

213.    The May 25, 2005 Thompson/Smith/Litvack Letter cited as examples of Wal-Mart's "ineffective internal controls" and "compliance breakdowns" not only the criminal conduct of former Wal-Mart Vice Chairman Thomas Coughlin, (that may have included bribery) but of even greater concern was the fact that the vice-president who reported Mr. Coughlin's questionable transactions was himself fired, revealing serious questions about "the past and future effectiveness of the company's whistleblowing programs and Wal-Mart's ability to enforce its Statement of Ethics & Code of Ethics."

214.    Less than three weeks after the Thompson/Smith/Litvack letter was sent, on June 13, 2005 California Controller Steve Westly, a trustee at the time of the California State Public Employee Retirement System (Calpers), the largest pension fund in the country, independently wrote a similar public letter to the Wal-Mart Audit Committee.

215.    In response to these demands for augmenting internal controls, received from large and reputable institutional investors, members of the Wal-Mart Board set up a meeting in New York City. A *Bloomberg* article dated April 12, 2007[4] revealed some of what occurred at this meeting by obtaining a deposition transcript of Charles Holley, then senior vice president for Finance at Wal-Mart and one of the attendees at the meeting. According to Holley's deposition, NYC Comptroller Thompson, representatives of state pension plans in Illinois, California, Connecticut and New Jersey were present in person, and fund managers based in the United Kingdom and Sweden, participated by telephone. The representatives of Wal-Mart included Charles Holley, the Chairman of Wal-Mart's Audit Committee, Roland Hernandez and Defendant Christopher Williams.

216.    Defendant Williams was on the Audit Committee for every other year through the

---

[4] Margaret Cronin Fisk and Lauren Coleman-Lochner, Wal-Mart Shareholders, Rebuffed on Labor Issues, Press for vote, *Bloomberg* (Apr. 12, 2007) (available at:
http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a0uoTK8cd0dE&refer=home.

present and served as the Chairman of the Audit Committee in Fiscal Years 2008, 2009, 2010 and 2011, overseeing the Company's compliance with laws and regulations. He also served on the Executive Committee from Fiscal Years 2007 through 2010 and in 2012 as well.

217. At the September 14, 2005 meeting, the investors repeated their demand for Wal-Mart to create an independent special committee to review and improve internal guidelines, for ensuring that compliance standards are met, and the manner of conducting investigations into executive wrongdoing are is improved. According to Holley's deposition, Hernandez and Williams rejected an idea of a special committee saying that it would be redundant because the Audit Committee already provided an independent voice for oversight.

218. According to Holley's deposition testimony (supported by contemporaneous notes from the discussion), the representatives of the Audit Committee (Hernandez and Defendant Williams), in truth, had other reasons to be cautious. If independent observers reviewed Wal-Mart, there was a "high risk" they could "get the issues wrong," Holley said, quoting Hernandez. In other words, Defendant Williams knew that Wal-Mart's internal controls were inadequate, but he rejected a special committee investigation even though it was requested by important institutional investors because he did not want an independent party to shed any light on matters that the Audit Committee wanted to keep buried.

219. Two months after the meeting, on November 30, 2005, NY City Comptroller Thompson again wrote to directors Hernandez and Defendant Williams, according to court filings in the Pennsylvania wage-and-hour case. This time, Thompson wrote, Wal-Mart's legal problems "strongly suggest a management culture of indifference." **"This culture originates at the highest levels of management." An attachment to the letter requested a detailed account of Company policies on whistleblowers and managers who violate Company ethics standards.** Investor Thompson, like whistleblower Cicero was rebuffed. Although Wal-Mart directors offered to meet again, the disgusted investors realized the futility of another meeting and Thompson's response to Hernandez was "To date, we do not feel we have received a meaningful response."

48

220.    At the very same time the Board members were ignoring the shareholder demands warning of the inadequacy of Board oversight over compliance with bribery laws and other laws and regulations and the effectiveness of the Company's whistleblowing controls (between September 2005 and February 2006), their colleague Defendant Scott was busy "deep sixing" the investigation into the Mexican bribe scandal begun by the Company's own Corporate Investigations unit, and putting the prime suspect, Mr. Rodriguezmacedo in charge of the investigation, and promoting the other prime subject, Eduardo Castro-Wright, to a more senior position in the United States.

221.    As a long-term member of the Audit Committee, Defendant Burns certainly knew about the complaints by whistleblower Bowen and about the complaints of angry institutional investors regarding Wal-Mart's ineffective internal controls over the occurrence of criminal acts like embezzlement and bribery, and its failure to effectively investigate such allegations. Nevertheless Defendant Burns took no action to remedy these controls, and consciously looked away and allowed the scandal of bribery in Mexico and its' cover-up to continue unabated.

222.    As a participant in the meetings with institutional investors where he rejected their demands for a special committee investigation and where, at least his colleague, Mr. Holley, suspected the real reason for the rejection was to allow the Company to continue to quash investigations into practices it had no intention of correcting, Defendant Williams at the very least consciously looked away and allowed the Mexican bribery scandal and cover-up to occur.

223.    As a member of the Compensation, Nominating and Governance Committees for every year from Fiscal Year 2005 until the present, Defendant Daft was charged with evaluating the CEO and self-appraising the work of the Committees and the Board. Had he carried out these duties loyally and in good faith, the cover-up orchestrated by Scott, Duke, S. Robson Walton and other executives would not have been allowed to occur.

224.    As a member of the Compensation, Nominating and Governance Committees for every year from Fiscal Year 2006 until the present, and as Chair of the Committee for Fiscal Years 2008 through the present Defendant Wolf was charged with evaluating the CEO and self-

49

appraising the work of the Committees and the Board. Had she carried out these duties loyally and in good faith the cover-up orchestrated by Scott, Duke, S. Robson Walton and other executives would not have been allowed to occur, and would have been brought to light in subsequent reviews.

**The Mexico Success Story Has An Ominous Side**

225.    During years 2005-2006 the International segment of Wal-Mart's business grew as the domestic segment plateaued. For example, Wal-Mart's March 31, 2005 10-K states: "Our International segment consists of retail operations in eight countries and Puerto Rico. This segment generated 19.7% of our fiscal 2005 sales." By the March 31, 2006 10-K states: "the International segment [grew to] 20.1% of our fiscal 2006 sales." And in the March 27, 2007 10-K stated: "our International segment generated 22.3% of our fiscal 2007 net sales." Moreover, Mexico accounted for one-fourth of the sales of Wal-Mart's international segment.

226.    The most successful foreign country in its International segment by far was Mexico. Wal-Mart's 2005 Annual Report listed the number of segment stores and other operations in each of the countries in which the International Segments operates. As the below list shows, Mexico alone accounted for over one-third of the locations in Wal-Mart's fifteen-country international division.

### Fiscal 2005 End of Year Store Count

| Country | Discount | Supercenters | Sam's Clubs | Neighborhood Markets |
|---------|----------|--------------|-------------|----------------------|
| Argentina | 0 | 11 | 0 | 0 |
| Brazil | 118 | 17 | 12 | 2 |
| Canada | 256 | 0 | 6 | 0 |
| China | 0 | 38 | 3 | 2 |
| South Korea | 0 | 16 | 0 | 0 |
| Mexico | 529 | 89 | 61 | 0 |
| United Kingdom | 263 | 19 | 0 | 0 |
| Puerto Rico | 9 | 4 | 9 | 32 |

227.    Wal-Mart de Mexico was widely viewed as a highly successful business operation

that stunned rivals with its rapid growth and success.  Indeed, in its 2006 Annual Report, Wal-

Mart de Mexico states:

> [D]uring 2006 we broke a new record in both investment and the
> number of Grand Openings – an investment of *$839 Million
> dollars* and the opening of *120 new units* from all our business
> formats.

(Emphasis in original).

228.    The success story of Walmex was a matter of public knowledge and commentary

in the 2005-2006 era.  It was not without its detractors, however, prompting headlines describing

Wal-Mart's entry into the Mexico market as the "Goliath"[5] or "Leviathan"[6] that has

"invade[d],"[7] "trounc[ed] the locals,"[8] "transform[ed] the Mexican market,"[9] and was decried as

a "threat to sovereignty."[10]   Although the matter of Mexico's stunning growth was of keen

interest to all Board members, it was particularly important to those members such as Breyer

serving on the Committee on Strategic Planning, because they were charged with the direct

responsibility to help develop, advise and assess the Company's strategic plans.   Had the

Strategic Committee members, including Defendant Breyer, performed their jobs faithfully and

loyally, they would have inquired whether Wal-Mart's exponential growth in Mexico was being

accomplished in compliance with the law.   Defendant Breyer already knew from the Kroll

investigation into sales tax evasion (*infra* at __) that there was reason to believe that executives

of Wal-Mart de Mexico were not above "shaving legal requirements" in their quest for profit and

fast growth.

**Substantial Liability of Personal Prosecution**

---

[5] *The Economist*, "Mexico's retail Goliath." *Business Latin America*. March 2, 2002: 4.

[6] *Miami Herald*, International Edition. "Wal-Mart leviathan squeezes competition." February 2, 2004.

[7] Weiner, Tim.  "Wal-Mart invades, and Mexico gladly surrenders." *New York Times*. Sec. A 1,9 December 6, 2003.

[8] Smith, Geri. "Mexico: war of the superstores.  Wal-Mart is trouncing the locals, but they're not giving up." *Business Week*. Sept. 23, 2002: 60.

[9] Luhnow, David. "Crossover success: How NAFTA helped Wal-Mart reshape the Mexican market." *Wall Street Journal*, sec. 1. August 31, 2001.

[10] González Amador, Roberto.  "Riesgo para la soberanía, el poder de Wal-Mart en el Mercado mexicano." *La Jornada*. P.22 July 8, 2004.

229. All nine current directors who served on the Board in the 2005-2006 period (or, like Defendant Duke, who was a high level executive at the time) Director Defendants Scott, S. Robson Walton, Jim Walton, Duke, Breyer, Burns, Daft, Williams and Wolf face a substantial likelihood of personal liability for allowing Wal-Mart to violate the FCPA in its Mexican operation, even if they lacked actual knowledge that any bribe was paid. To establish criminal liability under the FCPA, the Department of Justice need prove only that the director had a "high probability" that bribes were being paid in Mexico but "consciously and intentionally avoided confirming that fact." *See Kozeny*, 667 F.3d. at 132. Given the exponential growth of Wal-Mart's operations in Mexico, the Defendants' knowledge of the inadequacy of Wal-Mart's guidelines to ensure compliance with anti-bribery policy, and their refusal to take measures to shore up those known inadequate internal controls, recent findings of unlawful activity in Mexico by the Kroll investigation (*i.e.*, the cavalier attitude of Board members toward their own internal Corporate Investigations unit), there is a substantial likelihood that the Department of Justice will conclude that the director Defendants believed that bribes were probably being paid in Mexico but "consciously and intentionally avoided confirming that fact."

230. The Department of Justice has made clear that it will not look only to corporations for enforcement of the FCPA. Lanny Breuer, Assistant Attorney General for the DOJ's Criminal Division in speeches in November 2009 and again in February 2010 stated: "The prospect of significant prison sentences for individuals should make clear to every corporate executive [and] *every board member* . . . that we will seek to hold you personally accountable for FCPA violations. (Emphasis added). Violations of the FCPA under the 2002 amendment are classified as "public corruption offences" which under the Federal Statutory Guidelines carry a range of 10 months to 5 years prison time per offense before any enhancements. Factors which tend to reduce the severity of the punishment of the corporation and any individuals liable under the FCPA, such as a robust internal compliance procedure and voluntary self reporting, would not be available to the director Defendants here.

231. Each of the nine current director Defendants has a disabling interest in

extinguishing this derivative action because any additional factual investigation into their awareness of the 2005-2006 investigation into bribes in Wal-Mart de Mexico, or the cover-up of that investigation increases their risk of criminal prosecution.

232.    In addition, Defendant Gregory Penner is a tenth current Board member who is completely beholden to the Walton Family, including his father-in-law S. Robson Walton, for his lavish lifestyle and is thereby disabled to decide a shareholder demand because of lack of independence.

233.    Therefore, 10 of the 15 members of the current Board are disabled from deciding a demand either because they orchestrated the wrongful conduct, played an active role in the conspiracy, breached their duties of loyalty and good faith by consciously turning a blind eye to unlawful conduct thereby exposing themselves and the Company to a substantial likelihood of civil or criminal liability, or by virtue of marriage or birth to one of the principal wrongdoers lack the requisite independence.  As a result, Plaintiff has satisfied the demand futility standard under Delaware law.

## FIRST CLAIM FOR RELIEF

### (*Breach of Fiduciary Duty*)

234.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

235.    The Defendants each owe (or owed) Wal-Mart and its shareholders fiduciary duties of loyalty, good faith, and due care in managing the Company's affairs.

236.    As detailed above, the Defendants breached their breached their fiduciary duties of loyalty and good faith by:

> a.  failing to ensure that Wal-Mart, its directors and officers, complied with foreign and federal laws and Wal-Mart's own code of conduct;
>
> b.  failing to conduct an adequate investigation of known potential (and/or actual) violations of foreign and federal laws; and

53

       c.   covering up (or attempting to cover up) known potential (and/or actual) violations of foreign and federal laws.

237.    As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Wal-Mart has been damaged, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, the cost of defending Wal-Mart against government investigations and the penalties, fines and other liabilities and expenses associated with those investigations.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law and demand is excused;

B.    Awarding, against all Defendants and in favor of Wal-Mart, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Awarding to Wal-Mart restitution from Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.    Directing Wal-Mart to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: April 27, 2012

Respectfully submitted,

/s/ JAMES C. WYLY

**WYLY ROMMEL, PLLC**
James C. Wyly
Arkansas Bar No. 90158
jwyly@wylyrommel.com
Sean F. Rommel
Arkansas Bar No. 94158
srommel@wylyrommel.com
4004 Texas Blvd.
Texarkana, TX 75503
(903) 334-8646 (Telephone)
(903) 334-8645 (Facsimile)

**SCOTT+SCOTT LLP**
Joseph P. Guglielmo
jguglielmo@scott-scott.com
Judith S. Scolnick
jscolnick@scott-scott.com
Donald A. Broggi
dbroggi@scott-scott.com
Joseph Cohen
jcohen@scott-scott.com
500 Fifth Avenue, 40th Floor
New York, NY 10110
(212) 223-6444 (Telephone)
(212) 223-6334 (Facsimile)

-and-

Walter W. Noss
wnoss@scott-scott.com
Hal D. Cunningham
hcunningham@scott-scott.com
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 233-4565 (Telephone)
(619) 233-0508 (Facsimile)

## VERIFICATION

I, R. Randall Roche, on behalf of Louisiana Municipal Police Employees' Retirement System ("LAMPERS") hereby declare and verify that LAMPERS is currently an owner of Wal-Mart Stores, Inc. ("Wal-Mart") stock and has continuously been an owner of Wal-Mart stock since at least September, 2005. LAMPERS currently holds 37,671 shares of Wal-Mart stock.

I have reviewed the allegations of the Verified Shareholder Derivative Complaint and confirm that the action is not collusive and that LAMPERS is capable and willing to fairly and adequately represent the interests of shareholders who are similarly situated in enforcing the right of the corporation.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed this _____ day of April, 2012, at _____

                                    LOUISIANA MUNICIPAL POLICE
                                    EMPLOYEES' RETIREMENT
                                    SYSTEM

                                    _____
                                    R. Randall Roche

                                    Title:  General Counsel